IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| v. | * NO. |
| YAIR HADAR, a/k/a "Steven Gold," | * 19-0286 TJS |
| Defendant | * |

\*\*\*\*\*\*\*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A CRIMINAL COMPLAINT

I, Jeremy S. Desor, being first duly sworn, state:

### INTRODUCTION

1. I make this affidavit in support of an application for a criminal complaint and arrest warrant for YAIR HADAR, also known as "Steven Gold."

### AGENT BACKGROUND

2. I am a Special Agent of the Federal Bureau of Investigation (FBI), and I have been so employed for approximately 14 years. I am currently assigned to the FBI's Washington Field Office (WFO). As part of my assigned duties, I investigate possible violations of federal criminal law. I have also worked in the Chicago and San Francisco offices of the FBI. I have been assigned to squads that focus on the investigation of white collar crime in Chicago, San Francisco, and WFO. I have also worked in the Economic Crimes Unit at FBI Headquarters with program management responsibilities relating to white collar programs.

3. I am familiar with the information contained in this affidavit. This affidavit is based upon information from multiple sources—including reports of witness interviews, information provided to me by other law enforcement agents and officers, documents and financial

records provided by different entities and individuals, including regulatory agencies, and publicly available information.

4. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that HADAR has violated 18 U.S.C. § 1349 (conspiracy to commit wire fraud) in the District of Maryland and elsewhere.

## PROBABLE CAUSE

6. As explained further below, I respectfully submit that there is probable cause to believe that HADAR has violated 18 U.S.C. § 1349 (conspiracy to commit wire fraud) in connection with his conduct in the binary options industry as a representative under the brand name BigOption. Section I provides general background on binary options, as well as information concerning how binary options are sold and marketed. Section II provides background on BigOption and BinaryBook, a related brand. Section III summarizes certain investor complaints that the FBI has received relating to BinaryBook and BigOption, including a complaint by an investor located in Maryland. Section IV provides information relating to HADAR's role and conduct.

### I. Background on Binary Options

7. A binary option is a type of option contract in which the payout depends on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—will rise above or fall below a specified amount. Unlike standard options, investors in binary options are not given the opportunity to actually purchase a stock or a commodity but, rather, are effectively speculating on whether its price will be above or below a certain amount at a certain time of the day. When the binary option expires, the option holder will

typically receive either a pre-determined amount of cash or nothing. Binary options are sometimes referred to as "two-way" options.

8.      For example, an investor may expect that the price of an individual stock will be above $80 at 3:30 p.m. on a given day. The investor may then buy a binary option that allows her to place this bet at a cost of $60. If, at 3:30 p.m., the stock price is $80.01, the investor should receive an amount equal to the advertised payout. In this example, if the advertised payout was $90, the trade would have resulted in a profit of $30. If the price of the stock at 3:30 p.m. is $79.99, the investor loses her $60 investment. Investors can buy multiple binary options, which can significantly increase their returns or losses.

9.      The trading of binary options was facilitated by "platform providers," including a company named "SpotOption," which has referred to itself on its website as "today's leading technology platform provider."

10.     SpotOption and other platform providers offered a full range of services to sellers of binary options, which were referred to as "brands" or "brokers," including BinaryBook and BigOption. (The terms "brands" and "brokers" are used interchangeably throughout this affidavit to refer to entities engaged in the sale of binary options; the terms "broker" and "brokers" are also used to refer to certain individuals acting on behalf of these entities.) Among other services, the platform providers created and determined the terms of the options that were available to trade, provided an online trading interface through which trades were placed, provided brand website templates, and provided customer relationship management software to allow brands to track relevant data for each of their investors.

11.     Some binary options are listed on registered exchanges or traded on a designated contract market that are subject to oversight by U.S. regulators such as the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC"). However, a

3

large portion of the binary options market operated outside of these exchanges and markets. These operators typically utilized internet-based trading platforms, as was the case with BinaryBook and BigOption. There is no evidence that BinaryBook and BigOption facilitated trades in binary options on a legal and regulated designated contract market in the United States.

12. Binary options brands were the entities that dealt directly with end customers in the United States and elsewhere to take deposits and conduct trading activity. These organizations paid a fee in exchange for utilizing the services of platform providers such as SpotOption.

13. Binary options brands relied largely on "affiliate marketers" to generate leads for potential new investors through advertisement campaigns. These campaigns often touted the ease and rapid rate at which an individual could earn large returns and featured actors posing as investors who purported to have done so. These campaigns provided the opportunity for prospective investors to submit requests for additional information.

14. After requesting additional information, prospective investors were typically contacted by a representative of a particular binary options brand. The initial contact was typically made by a "conversion" agent from a brand—meaning a salesperson who was responsible for converting an individual into an investor by taking an initial deposit. Once an individual was converted into an investor, they were typically passed on to a brand's "retention" department, which employs retention agents who were responsible for working with the investor going forward with the goal of obtaining additional deposits.

15. The FBI has received a large number of complaints from U.S.-based investors reporting millions of dollars in losses across many different binary options brands, including BinaryBook and BigOption.

16. The volume of complaints and losses reported by investors to the United States government led the SEC's Office of Investor Education and Advocacy to issue an "Investor Alert"

titled "Binary Options Websites May Be Used for Fraudulent Schemes" in November 2016. The alert noted that representatives of binary options brands "may use fictitious names and tout fake credentials, qualifications, and experience." The alert warned individuals to look out for various red flags—such as "high pressure sales tactics or threats," "issues with withdrawals," "constant turnover of representatives," and "credit card abuse"—when considering whether to invest through a binary options website. The alert further stated that "in addition to perpetrating fraudulent investment schemes, the operators of binary options websites may be violating the federal securities laws through other illegal conduct." The other conduct described in the alert included "making material misrepresentations to investors" (as well as other potential violations of federal securities laws).

17.     In addition, in or around June 2017, Apple, Inc.—which manufactures and sells cellular phones popularly known as "iPhones"—updated its guidelines governing the review of proposed applications (or "apps") developed by third parties for use on iPhones, and the company specified that "[a]pps that facilitate binary options trading are not permitted." Public news reports indicate that the company made this revision as a result of complaints concerning fraud in connection with the purchase and sale of binary options.

## II.    Operations of BinaryBook and BigOption

18.     The FBI has interviewed two individuals, Witness #1 and Witness #2, both of whom formerly worked in the retention department for BinaryBook. Retention departments typically employed salespeople who contacted existing investors and solicited them for larger investments. The information Witnesses #1 and #2 provided with respect to the operations of BinaryBook and BigOption was consistent with information the FBI has learned about unregulated binary options

brands in general during its investigation[1]. BinaryBook and BigOption were related entities and many of the staff performed work related to both brands. As such, Witness #1 and Witness #2 are familiar with the operations of both BinaryBook and BigOption.

19.     Witnesses #1 and #2 advised that the retention departments for BinaryBook and BigOption were operated out of Israel.

20.     Witnesses #1 and #2 both stated that salespeople were instructed by management to lie to clients about their location by claiming to be located in parts of the world other than Israel.

21.     Witnesses #1 and #2 both reported that representatives of BinaryBook and BigOption utilized aliases when conducting business, particularly when communicating with investors. Witness #1 was instructed to choose an alias during training and to choose a name that sounded American in order to attract more investor deposits.

22.     According to Witnesses #1 and #2, salespeople working on behalf of BinaryBook and BigOption were taught to spend as much time as needed with prospective and current investors on the phone to gain their trust, build rapport, and develop a financial profile of them. Witness #1 was instructed to do whatever was necessary to extract as much money as possible from clients. When management identified a prospective investor who had significant assets, that individual was assigned to a salesperson who had proven effective at obtaining large deposits from others in the past.

23.     Unlike a company operating in a regulated market and matching a buyer and a seller, BinaryBook and BigOption were on the opposite side of their own clients' trades, as was standard for unregulated binary options brands. This meant that BinaryBook and BigOption only

---

[1]  Witness #2 has filed a whistleblower complaint with the SEC related to the conduct described herein, and may therefore be eligible for a monetary award from the SEC.

made money if their customers lost money. This fact was not disclosed to clients and, in fact, representations to the contrary were made to clients in that brokers represented that they were working on behalf of clients to help the clients make money. Multiple victims interviewed by the FBI stated that they would not have invested in the first place had they known that the binary options brands were on the opposite side of their trades.

24. According to Witnesses #1 and #2, salespeople working on behalf of BinaryBook and BigOption were instructed to address client withdrawal requests at the start of each shift. The sales staff was instructed by management to take steps to delay or prevent withdrawals. Sales staff sought to convince clients to keep their money on deposit by promising positive future results or offering special investment packages that did not actually exist. According to Witnesses #1 and #2, customers who deposited funds by wire had very little chance of executing a successful withdrawal request as there was no threat of a "chargeback" as there would be with credit card deposits.

25. According to Witnesses #1 and #2, managers got involved as needed in order to prevent customer withdrawals when a salesperson was unable to do so and used whatever means necessary to prevent withdrawals. According to Witness #2, this included using false claims about clients being involved in money laundering to lock client accounts and refuse withdrawal requests.

26. According to Witnesses #1 and #2, BinaryBook and BigOption offered bonuses to incentivize customers to deposit additional funds. These bonuses included terms that required customers to reach high levels of trade turnover before being able to make a withdrawal, which effectively locked customer accounts from withdrawals. According to Witness #1, bonuses were sometimes deposited into client accounts without the knowledge of the client in order to lock the account.

27. According to Witness #2, BinaryBook and BigOption offered purportedly insured trades to customers. In doing so, it was represented to the customers that they would be repaid for

any losses suffered in connection with the insured trades. According to Witness #2, any repayment on losses was treated as a bonus, thereby locking the client's account from withdrawals.

28.     BinaryBook and BigOption salespeople and managers received commissions based on the amount of deposits obtained. According to Witnesses #1 and #2, customer withdrawals were deducted from deposits when calculating commissions. This incentivized sales staff and managers to do everything possible to prevent withdrawals.

29.     Representatives of BinaryBook also appeared to have deliberately targeted vulnerable populations. In an email sent on or about March 23, 2016, a representative of BinaryBook sent an email to certain other representatives that included (among other things) a list of "[m]ain target clients." The list provided as follows:

- Retired People
- Social Security
- Pension
- Veterans

30.     SpotOption tracked financial data for brands operating on its platform in order to calculate the amount of fees the brands had to pay to SpotOption on an ongoing basis. The Israeli National Police conducted a search of SpotOption's office at the FBI's request in January 2018. Records obtained during the search included spreadsheets detailing deposit amounts obtained by BinaryBook and BigOption. The records showed that, as of December 31, 2017, BinaryBook had obtained approximately $97.9 million in total deposits and $77.5 million in net deposits from investors worldwide. The records showed that, as of December 31, 2017, BigOption had obtained approximately $80.0 million in total deposits and $64.4 million in net deposits from investors worldwide.

### III. Investor Complaints

31. The FBI has received numerous investor complaints relating to BinaryBook and BigOption. The allegations in the complaints corroborate the details provided by Witnesses #1 and #2 with respect to how BinaryBook and BigOption operated and treated their investors. The conduct described by the complainants is consistent with conduct described by complainants relating to many other unregulated binary options brands.

#### A. Complaints relating to BinaryBook

32. The FBI has received complaints relating to BinaryBook from over 30 investors alleging losses totaling more than $1 million. These complaints included allegations of unauthorized bonuses being deposited into accounts to tie up customer funds, as well as losses suffered due to unauthorized trades made after a withdrawal request by a client. The complainants also reported an inability to withdraw funds from their accounts. Some of the complaints are summarized as follows:

**Investor A**

33. Investor A invested approximately $45,000 with BinaryBook. Investor A was told by a broker that the broker made millions for his clients and won 85-95% of his trades. This broker told Investor A, "If you win, I win." The broker conducted most of the trading in Investor A's account.

34. Investor A's account grew at one point to as much as $92,000 including bonuses. Investor A then suffered losses of approximately $60,000 in her account. Investor A attempted to withdraw money from her account but was unable to do so. Investor A received various excuses as to why her withdrawal request was not processed. BinaryBook representatives encouraged Investor A to not withdraw her funds by telling Investor A that she would be a millionaire within a year. As of May 30, 2017, Investor A had not received any money back from BinaryBook.

**Investor B**

35. Investor B opened a BinaryBook account with a $250 deposit in or around November 2015. Investor B's main broker at BinaryBook was "Mila Morales." Morales told Investor B that she was a successful trader. Over time, Investor B invested approximately $385,000 with BinaryBook. Morales convinced Investor B to invest additional funds with BinaryBook in part by stating that Investor B would become eligible for risk-free trades and bonuses with increased trading volume. Investor B was promised that Investor B's profits would increase if Investor B invested additional funds. Investor B felt pressured to deposit additional funds into Investor B's account.

36. Investor B engaged in what were described to him as "risk-free trades," meaning Investor B would be repaid in full if the trades lost. Investor B was informed after-the-fact that Investor B needed to increase trading volume in Investor B's account beyond a certain threshold to be eligible for repayment. Investor B felt a lot of pressure to deposit additional funds in order to be able to reach the threshold to get his money back.

37. As of February 13, 2017, Investor B was unable to access his account information on the BinaryBook website. Investor B had hired an attorney who sent multiple letters to BinaryBook, including a cease-and-desist letter and a letter requesting the return of all of Investor B's money. BinaryBook did not respond to the letters. As of February 2017, Investor B had not received any funds from BinaryBook.

**Investor C**

38. Investor C is a resident of Gaithersburg, Maryland. All of the events described in this paragraph and the next paragraph occurred while Investor C was in Maryland. Investor C opened an account with BinaryBook in approximately August 2015 with an initial deposit of $250. Investor C traded the money himself without success. Investor C was then contacted by a

BinaryBook broker who told Investor C that BinaryBook could trade on Investor C's behalf. Investor C invested an additional $5,000 and signed an agreement to allow a BinaryBook broker to trade on his behalf. The broker lost most or all of Investor C's money quickly.

39. Investor C was then contacted by a new broker at BinaryBook who promised a return of more than 23% on an upcoming trade. Investor C agreed to invest an additional $5,000. The new broker deposited $5,100 in bonus funds into Investor C's account and promised Investor C that he would match up to another $25,000 in deposits with bonus funds. Investor C then deposited an additional $24,900 into his account. The broker traded Investor C's funds which resulted in losses of the entire account. Other brokers at BinaryBook then tried to convince Investor C to invest additional funds but he refused to do so. Investor C continued to communicate with BinaryBook employees until at least the end of 2015.

40. Investor C's communications with BinaryBook employees resulted in numerous electronic communications between Investor C in the District of Maryland and BinaryBook employees resulting in interstate wire transmissions. For example, on or about August 28, 2015, a BinaryBook employee emailed Investor C at his Google email account regarding bank wire transfer instructions in order to induce Investor C to make a deposit with BinaryBook. On or about November 3, 2015, a BinaryBook employee emailed Investor C at his Google email account regarding Investor C's purported "investment performance."

**B. Complaints relating to BigOption**

41. The FBI has received complaints relating to BigOption from over 15 investors alleging losses totaling approximately $143,000. Some of the complaints are summarized as follows:

**Investor D**

42. Investor D invested more than 27,000AUD with BigOption. Investor D was assigned a broker who helped Investor D execute trades. The broker stopped communicating with Investor D when Investor D refused to deposit additional funds into his binary options account. Investor D then received messages from other BigOption staff members advising Investor D that he had to conduct trades on his own. Investor D attempted to withdraw his funds but was told that he could not do so because he had received a bonus and had not met the trading threshold requirement of 30 times the bonus amount. Investor D has been unable to withdraw any of his money despite repeated attempts to do so.

**Investor E**

43. Investor E opened an account with BigOption by depositing $500 on his credit card. Investor E quickly lost $244 and stopped trading. Investor E was contacted repeatedly by BigOption brokers who attempted to convince Investor E to deposit additional funds into his account but Investor E refused to do so. Investor E attempted to withdraw the remaining balance in his account in April 2017 and received an email from BigOption stating his money could not be returned because he had not placed any trades within the last 30 days. The email stated Investor E would have to execute five trades before his money could be returned. This requirement to make a trade every 30 days had not been disclosed to Investor E previously.

**IV. YAIR HADAR**

44. Based on a review of emails obtained pursuant to a search warrant on Google, Inc. in the course of the investigation, HADAR began working as a representative of BigOption by at least in or about November 2014 and was working on behalf of BigOption as recently as August 2016.

45. Information gathered in the course of the investigation indicates that representatives of BinaryBook and BigOption, including HADAR, made materially false statements and failed to disclose material information to binary options investors about the true names, qualifications, and physical location of representatives of who were purporting to assist investors. For instance, internally circulated call scripts would advise representatives of BinaryBook and BigOption to falsely claim to be located in the city of London in the United Kingdom, and to falsely claim to have an educational background in economics.

46. Based on emails obtained pursuant to a search warrant on Google, HADAR used the alias "Steven Gold" when communicating with investors. This was standard among representatives of BinaryBook and BigOption. Such aliases were internally approved and referred to as "stage names."

47. HADAR's email signature for both internal and external correspondence listed the name "Steven Gold" with the title, "ACCOUNT MANAGER," and provided a London phone number, even though HADAR, BinaryBook, and BigOption employees were located in Israel.

48. I have also reviewed internal monthly sales reports for BinaryBook and BigOption for the time period of December 2014 through January 2016. These reports tracked total deposits and net deposits by salesperson. During this time period, which represented only a portion of the period in which HADAR worked for the company, HADAR brought in net deposits of more than $970,000 from investors worldwide. HADAR ranked 11th out of more than 200 salespeople who worked for BinaryBook and BigOption during at least a portion of this time period.

49. The FBI is in possession of at least four recorded phone calls between investors and HADAR, utilizing the alias "Steven Gold," on behalf of BigOption. Two of the four recorded phone calls appear to be with the same investor. It is unclear where these investors are located, and all appear to have reached "Gold" in connection with a complaint that they have about BigOption.

13

  a. During these calls, HADAR generally seeks to encourage additional investments or to prevent withdrawals, and he does not explain that his interest is adverse to the investors. As noted above, representatives of BinaryBook and BigOption were not representing the interests of investors: When investors lost money, the owners of BinaryBook and BigOption profited.

  b. For example, during one of the calls, an investor is complaining about an inability to withdraw funds and about promises by another company representative/co-conspirator that he claims were broken. Eventually, the investor threatens legal action, including on the basis—as he appears to believe—that BigOption's representatives are in another part of the United Kingdom than their contact information indicates. "Gold" does not acknowledge that neither he nor any BigOption client-facing staff are located anywhere in the United Kingdom and are, in fact, located in Israel.

  c. During another call, a different investor is complaining about losing money in his account. "Gold" attempts to placate him—among other things—by stating that he cannot guarantee anything, but that with an additional two or three months of trading on the investor's behalf, he can "turn [it] around."

50. I have also interviewed Investor F, a resident of New York, who invested with BigOption, and corresponded with "Gold" as an "Account Manager" on behalf of BigOption. Prior to the interview, Investor F provided me with records of his email correspondence with "Gold," which showed the following:

  a. On December 14, 2014, "Gold" wrote to Investor F, "Following our previous phone conversation, I am writing you this email to give you a summary of what we discussed…you will be receiving an *[sic]* 100% bonus on your investment including secured trades under the protected trade category within Big Option's insurance plan. The

average profit you should be expecting will be around 20-35% on a monthly basis. This means that the estimated amount of returns will be around 5-7k monthly."

   b.   In a December 17, 2014 email exchange, Investor F wrote to "Gold," "I have been thinking about our conversation the other night and I would like to do everything possible to get into the higher profit margin per month." Investor F later wrote on the same day, "So if I deposit 25k tomorrow, then the remaining 5k after the first of the year, the full 30k will be insured?" "Gold" responded that day, "Correct you have the Wire [sic] information."

   c.   In a December 18, 2014 email, "Gold" wrote to Investor F, "As you know, my only incentive is to maintain you as a long-term client and to have you expand my portfolio to as much as you can…I have contacted Big Option's banks and we are more than ready to insure this investment at this time in the market."

   d.   In a March 1, 2015 email exchange, Investor F expressed concern over losing trades "Gold" had placed in his account. "Gold" replied, "There is nothing to be worried [sic] all of the trades are insured even with some profits. I have placed some more trades for you. I don't have your account information so i [sic] did it on a separate account [sic] when the trades are over we will put the funds in your account…"

   e.   On July 15, 2015, "Gold" sent an email to Investor F with the header, "Agreement on deposits." In the email, "Gold" wrote, "With a further investment of a minimum of 15k [sic] We are going to have a 5 month plan to achieve 100k into the account. (with a Seven [sic] figure account) [sic] The funds invested with BigOption will be insured with BigOption funds. They [sic] expenses for the loans will be cover [sic] by BigOption. By adding an additional amount to the 15K, you will be granted a bigger bonus

into the account." In responding to this email and in later emails, Investor F referenced efforts he was making to obtain a loan to fund his investment.

51. In addition to providing the above-referenced email correspondence, Investor F informed me that:

    a. "Gold" was Investor F's main account manager throughout the time period in which Investor F maintained a BigOption account. "Gold" told Investor F that he was very experienced in the financial industry and had worked for multiple brokers prior to working for BigOption. "Gold" stated that BigOption was better than the companies he had previously worked for and this enabled him to make more money for himself and his clients.

    b. "Gold" said he was paid on successful trades. "Gold" said he did not get paid unless Investor F got paid. "Gold" stated that Investor F's success would be equally beneficial to "Gold" as it would be to Investor F.

    c. "Gold" referenced monthly returns over the phone that were in line with the 20-35% per month amount referenced in the December 14, 2014 email from "Gold." "Gold" said the returns would vary from month-to-month.

    d. Investor F initially planned to invest only $5,000 to $10,000 with BigOption and sought information from "Gold" about the type of return that could be achieved with this level of investment. "Gold" explained that a higher investment amount would place Investor F into a premium account level and allow Investor F to generate larger returns. "Gold" stated he could turn a $30,000 to $50,000 investment from Investor F into "seven figures" within 12 to 18 months. "Gold" said he had achieved these types of results for other clients in the past.

  e. Over time, Investor F invested a total of at least $34,000 into his BigOption account based on representations made to him by "Gold" with respect to the security of the investment and the returns he could achieve. Investor F took out a personal loan and advances on credit cards at the urging of "Gold" in order to fund deposits into his BigOption account.

  f. Sometime in or after June 2016, "Gold" contacted Investor F and informed him that all of the money in his account had been lost. "Gold" referenced an unexpected drop in the value of an investment or asset when explaining the losses. Investor F assumed he would get his initial money back due to the insurance but "Gold" stated he had used the insurance funds to try to make back the losses and the insurance money was therefore lost as well. Investor F asked "Gold" about a $50,000 bonus he had been promised if "Gold" failed to meet the investment goals they had talked about and "Gold" referred to "some fine print" in explaining why Investor F would not get the $50,000.

19-0286TJS

## CONCLUSION

52. Based on the forgoing, I request that the Court authorize the attached complaint charging HADAR with violating 18 U.S.C. § 1349 (conspiracy to commit wire fraud) in the District of Maryland and elsewhere, and issue the proposed arrest warrant.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Jeremy S. Desor
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on January 23, 2019

Honorable Timothy J. Sullivan
UNITED STATES MAGISTRATE JUDGE

18